AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Eastern District of Virginia

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*
Seven cellular telephones, currently located at 6715 Little
River Turnpike, Annandale, Virginia

)
)
)
)
)
)

Case No.  1:18-sw- 704

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A

located in the _____ Eastern _____ District of _____ Virginia _____ , there is now concealed *(identify the person or describe the property to be seized)*:
 See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Section 841, 846 | Conspiracy to distribute cocaine |
| 18 U.S.C. Section 924(c) | Possession and Use of Firearm During and in Furtherance of Drug Trafficking |

The application is based on these facts:
See affidavit

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA/SAUSA:

Michael P. Ben'Ary

_____
*Applicant's signature*

Julie Whisenhunt, DEA Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 10/2/18  10:30a

_____
/s/
Theresa Carroll Buchanan
United States Magistrate Judge
*Judge's signature*

City and state: Alexandria, Virginia

The Hon. Theresa Carroll Buchanan, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

1.      The property to be searched is:  (1) a LG cellular phone, Model No: LM-X212TA, Serial No:  808CYVU224183; (2) a LG cellular phone, Model No: LG-M150, Serial No: 710CQNL215063;  (3)  an  LG  cellular  phone,  Model  No:  LG-VS425LPP,  Serial  No: 712VTCL2055051;  (4)  an  LG  cellular  phone,  Model  No:  LG-VS425LPP,  Serial  No: 712VTQS2055220;  (5)  an  iPhone,  Model  No:  A1586,  FCC  ID:  BCG-E2816A,  IMEI: 355410075924714;  (6)  an  iPhone,  Model  No:  A1586,  FCC  ID:  BCG-E2816A,  IMEI: 359480086127132; and (7) an iPhone, Serial No.  356704084717807 (hereinafter the "Devices"). The Devices are currently located at 6715 Little River Turnpike, Suite 303, Annandale, Virginia 22003

2.      This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

ATTACHMENT B

1.      All records on the Device described in Attachment A that relate to violations of Title 21, United States Code, Sections 841(a)(1) and 846 and involve Roger VINCENT, including, but not limited to:

      a.  assigned telephone number, push-to-talk number, and email address;

      b.  contact list, recent call list, missed call list, outgoing call list, and incoming call list;

      c.  stored text messages, stored photos, and stored videos;

      d.  lists of customers and related identifying information;

      e.  types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

      f.  any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

      g.  any calendar/date-related information regarding meetings, travel, etc.;

      h.  all bank records, checks, credit card bills, account information, and other financial records.

2.      Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division



| IN THE MATTER OF THE SEARCH OF SEVEN CELLULAR TELEPHONES, CURRENTLY LOCATED AT 6715 LITTLE RIVER TURNPIKE, SUITE 303, ANNANDALE, VIRGINIA 22003 | No. 1:18-sw- 704 |
|---|---|

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Julie D. Whisenhunt, a Special Agent with the United States Drug Enforcement Administration (DEA), being duly sworn, state as follows:

### INTRODUCTION

1.     I have been a Special Agent of the DEA since January 1997.  During my time in law enforcement, I have participated in the application for and execution of numerous arrest and search warrants in the investigation of narcotics and organized crime related offenses, resulting in the prosecution and conviction of numerous individuals and the seizure of illegal drugs, weapons, stolen property, and other evidence of criminal activity.

2.     As a narcotics investigator, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding the acquisition, sale, importation, manufacture, and distribution of controlled substances.  I have gained knowledge in the use of various investigative techniques including the use of wiretaps, physical surveillance, undercover agents, confidential informants and cooperating witnesses, the controlled purchases of illegal narcotics, electronic surveillance, consensually monitored recordings, investigative interviews, financial investigations, the service of administrative and grand jury subpoenas, and the execution of search and arrest warrants.  Through my training and experience, I am familiar with the actions,

habits, traits, methods, and terminology utilized by the traffickers and abusers of controlled dangerous substances.

3.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property, electronic devices described in Attachment A, which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

IDENTIFICATION OF THE DEVICES TO BE EXAMINED

5.      The property to be searched is: (1) a LG cellular phone, Model No: LM-X212TA, Serial No: 808CYVU224183; (2) a LG cellular phone, Model No: LG-M150, Serial No: 710CQNL215063; (3) an LG cellular phone, Model No: LG-VS425LPP, Serial No: 712VTCL2055051; (4) an LG cellular phone, Model No: LG-VS425LPP, Serial No: 712VTQS2055220; (5) an iPhone, Model No: A1586, FCC ID: BCG-E2816A, IMEI: 355410075924714; (6) an iPhone, Model No: A1586, FCC ID: BCG-E2816A, IMEI: 359480086127132; and (7) an iPhone, Serial No. 356704084717807 (collectively hereinafter the "Devices"). The Devices are currently located at 6715 Little River Turnpike, Suite 303, Annandale, Virginia 22003.

2

PROBABLE CAUSE

6.      The DEA is investigating the cocaine trafficking, heroin trafficking, and money laundering activities of a drug trafficking organization (DTO) operating distribution cells throughout the United States including in and around the Eastern District of Virginia. Through call data record analysis, GPS monitoring, surveillance, and information obtained from confidential sources, law enforcement has been able to identify several individuals working for the organization, including Roger VINCENT.

7.      During the week of August 12, 2018, a co-conspirator of VINCENT (CC-1) was in telephonic contact with a confidential source ("CS"). CC-1 was located outside of the Washington, DC metropolitan area.   Under the direction and supervision of DEA agents, CS purported him/herself to be a source of supply for cocaine. During the conversation, which was consensually recorded, CC-1 and the CS used coded language to discuss the potential sale/purchase of multi-kilogram quantities of cocaine.  In summary, CC-1 stated that he had an associate "with the Redskins" that CC-1 has been dealing with for 15 years.   Based on my knowledge of the investigation, I believe that CC-1 was indicating that he had a partner in the cocaine distribution business who was located in the Washington, DC area. CC-1 further explained that his associate was currently supplied by a California source. CC-1 stated that his associate would be done with his/her current order of "50 pieces" within the month.  Based on my knowledge of the investigation, I believe that CC-1 was indicating that his associate was nearly finished selling a shipment of 50 kilograms of cocaine, which his associate had received from his source of supply in California. CC-1 offered to meet together with the CS and CC-1's associate to "get comfortable" and "work out the

3

wrinkles" regarding the price and quantity of kilos to be sold/purchased. CC-1 and the CS agreed to meet at a later date.

8.      Agents reviewed CC-1's call detail records during the time surrounding the communications between CC-1 and the CS. Agents noted numerous communications between CC-1 and (202) 957-6590, a cell phone known to be used by VINCENT during this time frame (hereafter, "Vincent Cell Phone-1").   Agents believe the communications between CC-1 and VINCENT were in reference to CC-1's conversation with the CS regarding the potential sale/purchase of multi-kilogram quantities of cocaine.

9.      Later during the week of August 20, 2018, CC-1 was in telephonic contact with the CS. During the conversation, which was consensually recorded, CC-1 and the CS agreed to meet at the MGM National Harbor, 101 National Ave, Oxon Hill, Maryland on Monday, August 27, 2018 to further their negotiations. CC-1 indicated that his associate would be at the meeting. Again, call detail records revealed numerous communications between CC-1 and Vincent Cell Phone-1.

10.      On August 27, 2018, CC-1 and his associate met the CS at a restaurant located within the MGM National Harbor. During the meeting, which was consensually recorded and monitored by law enforcement, CC-1's associate was identified as VINCENT. During this meeting, CC-1 and VINCENT negotiated a purchase price of $28,000 per kilogram of cocaine and indicated that they would initially purchase five kilos, with the intent to purchase additional multi-kilogram quantities in the future. CC-1 and VINCENT agreed to meet with the CS the following day to see a sample of cocaine.

4

11.     On August 28, 2018, VINCENT and CC-1 met with the CS at a restaurant located in Alexandria, Virginia, within the Eastern District of Virginia.  During this meeting, which was consensually recorded and monitored by law enforcement, a detective, acting in an undercover capacity (hereinafter "UC") and the CS, displayed ten kilograms of cocaine to VINCENT and CC-1 in the parking lot of the restaurant.  VINCENT personally inspected one kilogram of cocaine and agreed to purchase multiple kilograms after collecting money.

12.     During the evening of August 28, 2018, CC-1 had several phone calls and text messages with the CS indicating that CC-1 and VINCENT had expected the CS would give the five kilograms of cocaine to them on consignment.  The CS advised that the CS would not "front" the cocaine on an initial transaction.  These calls and text messages were consensually recorded.

13.     On August 29, 2018, CC-1 called the CS and advised that they (CC-1 and VINCENT) had the money to purchase two kilograms of cocaine.  CC-1 said that after the initial purchase of two kilos, they would sell it to "Boobe's people" and return with the money to purchase additional kilos.  "Boobe" is an alias used by VINCENT.

14.     On September 3, 2018, VINCENT, using Vincent Cell Phone-1, sent a text message to the CS stating, *"What up this the brother u met at MGM lock my number in and give me a call or text when ever."*  Telephonic negotiations between the CS and VINCENT and CC-1 continued.  These calls and text messages were consensually recorded.

15.     On September 12, 2018, VINCENT spoke with the CS and agreed to meet in person the same day at the MGM National Harbor.  During the meeting, which was consensually recorded and monitored by law enforcement, VINCENT and the CS continued discussions about a future

5

transaction. In summary, VINCENT stated he has been dealing with a couple customers for 15 to 20

years. VINCENT said that he would initially purchase two kilograms from the CS and then he

would return to purchase five to eight more kilos. Toward the end of the meeting, VINCENT said

that he would be getting a new phone number and would text the number to the CS. VINCENT told

the CS to give him a call the day before the transaction so VINCENT could line things up.

16.     On October 23, 2018, VINCENT, using 202-683-0435 (hereafter "Vincent Cell

Phone-2"), sent text messages to the CS stating, *"What good? You around?"* and *"New#"*. The

following day, VINCENT, using Vincent Cell Phone-2, and the CS spoke regarding a potential

cocaine transaction. In summary, VINCENT and the CS agreed to conduct a transaction on Monday,

October 29, 2018. These calls and text messages were consensually recorded.

17.     On October 29, 2018, VINCENT met with the CS at a hotel located in Oxon Hill,

Maryland. This meeting was consensually recorded and monitored by law enforcement. In the hotel

room, the CS showed VINCENT a duffle bag containing five kilograms of cocaine. VINCENT

removed one kilogram and cut into the packaging to examine the cocaine. VINCENT then removed

a large quantity of U.S. currency from his person and proceeded to count $29,000 to pay for one

kilogram. VINCENT then removed two kilograms from the duffle bag and placed one in his pants

and one under his coat, with the understanding that VINCENT would return later that evening to pay

for the second kilogram he received on consignment. VINCENT asked the CS if he could obtain the

remaining three kilograms from the CS when he returned. VINCENT also asked if the CS had

additional kilograms that VINCENT could purchase the following day. After VINCENT exited the

hotel room with the two kilograms, he was taken into custody. A search of VINCENT resulted in the

6

seizure of the two kilograms of cocaine, a pistol holster, $2,463.00 U.S. currency, and a cellular telephone. An inventory search of VINCENT's vehicle, which was located in the hotel parking lot resulted in the seizure of a loaded 9 mm Glock 43 pistol, a loaded AK-47 assault rifle, and five additional cellular telephones.

18.     On October 29, 2018, the Honorable Gina L. Simms, United States Magistrate Judge, District of Maryland, issued a warrant authorizing a search of 3210 Carlton Avenue, Temple Hills, Maryland, an address known to be associated with VINCENT. Agents executing the search found and seized a loaded Glock 27 pistol, paraphernalia, miscellaneous documents, and a cellular telephone. The one cellular phone seized from VINCENT's person, five cellular phones seized from VINCENT's vehicle, and one cellular phone seized from Carlton Avenue ("the Devices") are further identified in Attachment A.

19.     The Devices are currently in the lawful possession of the DEA at 6715 Little River Turnpike, Suite 303, Annandale, Virginia 22003. In my training and experience, I know that the Devices have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of the DEA.

20.     Based on my training and experience, I am aware that drug traffickers commonly make and maintain business records. Specifically, it is quite common for those involved in the manufacture, sale, purchase, and transportation of controlled substances to generate and maintain writings, books, records, receipts, notes, ledgers, lists, airline tickets, money orders, package and shipping labels, and other memoranda to assist in their criminal activities. . These materials are

7

created and maintained in much the same way and for the same reasons as persons involved in legitimate businesses. Drug traffickers maintain records in order to know the current status of the various illegal transactions in which they are involved. Without the aid of such records, drug traffickers would face a high possibility of error and mistake due to the number, complexity, and frequency of their transactions, and the clandestine nature of drug trafficking activities.

21.     Based on my training and experience, I am also aware that drug traffickers commonly maintain addresses or telephone numbers in books or papers, which reflect names, addresses and/or telephone numbers of their associates in drug trafficking. They also store such information, as well as photographs, messages, and personal notes, in electronic equipment including, but not limited to, computers, cellular phones and other electronic software and mediums. Drug traffickers often take or cause to be taken photographs and/or videotape of themselves, their associates, their property, and evidence of their drug trafficking. These materials are usually maintained in their possessions, to include cellular devices, and/or residences.

22.     I am further aware from my training and experience that drug traffickers commonly use cellular phones, as well as other communication devices, to keep in constant contact with their suppliers, associates, and clients in drug trafficking. Drug traffickers have also been known to use electronic data processing units, including all internal and external storage devices and related hardware and software, to hold files that contain names, addresses, and/or telephone numbers of their associates in drug trafficking. They also use such devices to maintain and electronically record receipts, notes, ledgers, owe sheets, financial information, money orders, and other records relating to the transportation, ordering, sale, and distribution of controlled substances.

8

23.     Based upon the foregoing, I submit there is probable cause to believe the Devices described in Attachment A contain evidence of a conspiracy to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

TECHNICAL TERMS

24.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

9

b.  Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24

10

NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every

11

computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

25.    Based on my training, experience, and research, I know that the Devices have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

26.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

27.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of

12

the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

      a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

      b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

      c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

      d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

  e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

  28. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

  29. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

CONCLUSION

30.     I submit that this affidavit supports probable cause for a search warrant authorizing

the examination of the Devices described in Attachment A to seek the items described in Attachment

B.


Special Agent Julie D. Whisenhunt
Drug Enforcement Administration


Sworn and subscribed to before me
This __21__ day of November, 2018.

/s/
Theresa Carroll Buchanan
United States Magistrate Judge

_____
The Honorable Theresa Carroll Buchanan
United States Magistrate Judge

15

## ATTACHMENT A

1.       The property to be searched is: (1) a LG cellular phone, Model No: LM-X212TA, Serial No: 808CYVU224183; (2) a LG cellular phone, Model No: LG-M150, Serial No: 710CQNL215063; (3) an LG cellular phone, Model No: LG-VS425LPP, Serial No: 712VTCL2055051; (4) an LG cellular phone, Model No: LG-VS425LPP, Serial No: 712VTQS2055220; (5) an iPhone, Model No: A1586, FCC ID: BCG-E2816A, IMEI: 355410075924714; (6) an iPhone, Model No: A1586, FCC ID: BCG-E2816A, IMEI: 359480086127132; and (7) an iPhone, Serial No. 356704084717807 (hereinafter the "Devices"). The Devices are currently located at 6715 Little River Turnpike, Suite 303, Annandale, Virginia 22003

2.       This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

ATTACHMENT B

1.     All records on the Device described in Attachment A that relate to violations of

Title 21, United States Code, Sections 841(a)(1) and 846 and involve Roger VINCENT, including,

but not limited to:

      a.  assigned telephone number, push-to-talk number, and email address;

      b.  contact list, recent call list, missed call list, outgoing call list, and incoming call list;

      c.  stored text messages, stored photos, and stored videos;

      d.  lists of customers and related identifying information;

      e.  types, amounts, and prices of drugs trafficked as well as dates, places, and amounts
         of specific transactions;

      f.  any information related to sources of drugs (including names, addresses, phone
         numbers, or any other identifying information);

      g.  any calendar/date-related information regarding meetings, travel, etc.;

      h.  all bank records, checks, credit card bills, account information, and other financial
         records.

2.     Evidence of user attribution showing who used or owned the Device at the time the

things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved

usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of

evidence in whatever form and by whatever means they may have been created or stored, including

any form of computer or electronic storage (such as flash memory or other media that can store

data) and any photographic form.